WILLIAM KNIGHT and Others, Copartners, Composing the Firm of KNIGHT & McDOUGAL, Appellants, Respondents, *v.* THE DELAWARE AND HUDSON COMPANY, Respondent, Appellant.

First Department, June 8, 1917.

Carriers — conversion — diversion by defendant of carloads of grain on bills of lading for which plaintiffs had made advances — knowledge by plaintiffs as to diversion of merchandise represented by earlier bills of lading.

Where in an action for damages resulting from the diversion by the defendant of certain carloads of grain, the bills of lading for which plaintiffs held and had made advances upon, it appears that the bills of lading actually represent grain received by defendant and in its possession when plaintiffs made the advances, it will be held that the plaintiffs acquired a special property in the grain, and that when defendant permitted it to be diverted into other hands it committed a conversion of plaintiffs' property which it could justify only by showing actual consent or acquiescence on the part of the plaintiffs.

Evidence examined, and *held,* insufficient to establish such consent or acquiescence.

The fact that plaintiffs had knowledge that merchandise represented by other and earlier bills of lading upon which they had made advances had been diverted without their consent, is insufficient as a defense, although it should have aroused the plaintiffs' suspicions.

Action for damages caused to plaintiffs by reason of having made advances upon bills of lading issued by defendant which did not represent and never had represented any actual merchandise. *Held,* that the complaint was properly dismissed on the ground that when plaintiffs made the advances they had reason to believe that the statements made in earlier bills of the same description were untrue, and hence their advances were not made in good faith and in reliance upon the bills of lading.

DAVIS, J., and CLARKE, P. J., dissented, with opinion.

CROSS-APPEALS by the plaintiffs, William Knight and others, and by the defendant, The Delaware and Hudson Company, from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 18th day of September, 1914, upon the report of a referee appointed to hear and determine the issues.

*Herman Aaron,* for the plaintiffs.

*Morgan J. O'Brien,* for the defendant.

SCOTT, J.:

The complaint states two causes of action. The first is for damages resulting from the diversion by defendant of certain carloads of grain the bills of lading for which plaintiffs held and had made advances upon. This cause of action rests upon tort. The second cause of action is for damages which plaintiffs suffered by reason of having made advances upon bills of lading issued by defendant which did not represent and never had represented any actual merchandise. This cause of action rests upon estoppel. (*Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co.*, 106 N. Y. 195.)

As to the second cause of action the referee dismissed the complaint on the ground that when plaintiffs made the advances upon the bills of lading comprised within that cause of action they had reason to believe, and must have known or believed, that the statements made in earlier bills of the same description were untrue, or, at least, had such knowledge or information as to put them upon inquiry as to the genuineness of the bills upon which they were making advances. He, therefore, concluded that such advances were not made in good faith, and in reliance upon the bills of lading, and consequently that plaintiffs were not entitled to the benefit of the rule stated in the *Bank of Batavia Case* (*supra*). With this conclusion we all agree.

The only question in the case upon which we are not agreed is as to the first cause of action upon which the referee has awarded judgment to the plaintiffs. The bills of lading upon which that cause of action is based did actually represent grain which had been received by defendant and was actually in its hands when plaintiffs made advances upon them. They thereby acquired a special property in the merchandise, and when defendant permitted this merchandise to be diverted into other hands it committed a conversion of plaintiffs' property. This conversion it could justify only by showing actual consent or acquiescence on the part of plaintiffs and this defense it failed to establish. It may be, as defendant strenuously argues, that plaintiffs had knowledge that merchandise represented by other and earlier bills of lading upon which they had made advances had been diverted without their consent. But such knowledge falls far short of a consent

to such diversion of the merchandise represented by the later bills. Of express consent to such diversion there is absolutely no evidence. The most that can be said is that there were certain circumstances relating to earlier transactions which should have aroused plaintiffs' suspicions, and that as prudent men they should have refrained from dealing with bills of lading issued by defendant to Durant & Elmore, from whom plaintiffs received them. To uphold this defense would be equivalent to permitting a tort feasor to escape the consequences of his wrongdoing by pleading that his reputation was so bad that no one was justified in relying upon his representations. This is not the law. We are, therefore, of the opinion that the referee rightly disposed of both causes of action and the judgment is consequently affirmed, with costs.

PAGE and SMITH, JJ., concurred; CLARKE, P. J., and DAVIS, J., dissented.

DAVIS, J. (dissenting):

The judgment was in favor of the defendant on plaintiffs' second cause of action and with certain modifications in favor of the plaintiffs on their first cause of action.

I do not agree with the opinion of a majority of the court that the plaintiffs' judgment on the first cause of action should be affirmed. In my opinion the judgment in that respect should be reversed.

The plaintiffs are grain brokers and grain commission merchants engaged in business on the New York Produce Exchange and the Chicago Board of Trade. The defendant is a corporation operating a railroad in the central and northeasterly part of New York State. Through its connection with the Erie railroad, the Lackawanna railroad and by trackage rights over the Erie with the Lehigh Valley railroad at Owego, it becomes a connecting link between the Boston and Maine railroad and the three trunk lines just mentioned.

As a first cause of action plaintiffs allege that they are holders for value of certain order bills of lading for 124,965 bushels of corn and 16,500 bushels of oats issued to them in January, 1910, received by the defendant for shipment over its road; that under these order bills of lading the defendant was bound to deliver the grain represented by the bills

only upon the surrender to it of the bills of lading properly indorsed; that defendant, in disregard of its obligation, *diverted* said grain from plaintiffs and caused it to be delivered to others than the plaintiffs without first receiving plaintiffs' bills of lading, and issued therefor other order bills of lading covering said grain certifying and declaring that it received said grain from persons other than plaintiffs and agreeing in said latter bills of lading to deliver said grain only upon the surrender of said bills of lading, ignoring entirely the existence of the bills of lading held by plaintiffs, and that said grain was reasonably worth $97,499.04.

The answer to the first cause of action admits the receipt of the grain represented by some of the bills of lading, but alleges that the grain it received and transported was the property of the Durant & Elmore Company; that the Durant & Elmore Company assumed full control of the grain and had diverted it from its original destination and directed its transportation to persons and places designated by it and that all this had been done by the Durant & Elmore Company with the assent of the plaintiffs, who in fact were not *bona fide* pledgees of said bills of lading. The answer also alleges: That the plaintiffs permitted the said Durant & Elmore Company to hold itself out to the carriers transporting such grain, including the defendant, as the owner thereof, or as authorized to act and direct in the movement and disposition thereof as the owner thereof and to collect and receive the proceeds derived from the ultimate disposition of said grain; and that the defendant was justified, from all the facts and circumstances connected with the receipt of said grain by it and with its final disposition so far as the defendant was concerned therewith, in believing and did believe that the said Durant & Elmore Company was the owner of said grain and that no other person or corporation had any right thereto or interest therein, and that said company might lawfully direct the defendant as to the movement and disposition of said grain when it was so received by it as admitted herein, and so believing, the defendant transported and delivered said grain in compliance with the orders and directions of said company and in so doing discharged its full obligation with reference thereto.

The plaintiffs held these bills of lading ostensibly as pledgees of the grain represented thereby to secure the payment of drafts drawn upon them by the Durant & Elmore Company, a corporation doing business at Albany as dealers in grain and owners of the grain referred to here. Judgment was entered in favor of the plaintiffs on the first cause of action for $73,956.79, the recovery being limited to the amount for which the grain was pledged and interest. The defendant appeals from so much of the judgment as awards this recovery to the plaintiffs.

In their second cause of action plaintiffs sought to recover $144,225 upon certain other bills of lading issued in January, February and March, 1910, by one H. C. Palmer, an agent of the defendant, which bills of lading indorsed by the Durant & Elmore Company were transferred and delivered by the Durant & Elmore Company for value to the plaintiffs and upon which the plaintiffs, relying upon these bills of lading, paid out therefor and advanced to the Durant & Elmore Company $144,225.

As a defense to the second cause of action defendant alleges that the bills referred to and relied upon by plaintiffs were fraudulent and fictitious and did not represent actual shipments and that the defendant at no time became liable thereon; that Palmer had no authority to issue the bills; that the purported bills of lading were in such form and contemplated the movement of the grain over such routes, and came into the possession of plaintiffs under such circumstances, as to give plaintiffs notice of their fraudulent character; that plaintiffs were put upon notice to ascertain the authority of the person executing and issuing the bills on behalf of defendant and the fact of the property mentioned in them being in the possession of defendant in order to entitle them to rely thereon as valid securities; that had they made inquiry the false and fraudulent character of said bills would have been revealed to the plaintiffs and that, therefore, plaintiffs were not innocent purchasers and holders of said bills of lading without notice of their invalidity.

The bills mentioned in the second cause of action are known as the Palmer bills and are concededly fraudulent. The bills mentioned in the first cause of action are known

as New England bills. The plaintiffs made their first advance on the Palmer bills January 8, 1910, and their last advance on March 12, 1910. The advances on the bills of lading mentioned in the first cause of action were made between November 16, 1909, and February, 1910. In dismissing the second cause of action upon the ground that the plaintiffs were not holders of the Palmer bills of lading in good faith, the learned referee in the course of his opinion says:

" The Palmer bills in suit were part of a series of similar bills upon which plaintiffs made advances to Durant & Elmore Company beginning January 7, 1910. At that time the plaintiffs held a large amount of New England bills on which they had made very large advances to Durant & Elmore Company — bills which had been so long outstanding that a man of ordinary intelligence could hardly have avoided suspicion that Durant & Elmore Company had somehow got control of the grain and disposed of it, especially if he knew of their doings with respect to grain in Buffalo elevators, * * * but I think that from past experience the plaintiffs on January 7, 1910, must have had a suspicion that the grain covered by the New England bills which they held had, all or some of them, got into Durant & Elmore Company's control and been disposed of, and if they had no such suspicion, then they must have thought that Durant & Elmore were carrying a very heavy load of grain which they had been unable to sell and were likely to be able to sell only at a very heavy loss. It seems to me that they must have had suspicion of dangers of one kind or another, so that when the Palmer bills came to them they came to persons whose minds were already charged with suspicion, and such suspicion must have grown from the date of their first advance upon such bills, January 8th, to the date of the last of their advances involved in this suit, March 12th."

The referee's finding of fact which led to the dismissal of the second cause of action is supported by abundant and convincing evidence. But I am of opinion that the evidence required the dismissal of the first cause of action as well. The first cause of action is for the conversion of grain by defendant, for which the plaintiffs held bills of lading upon which they had made advances to the Durant & Elmore

Company. The alleged conversion consisted in the defendant delivering to the Durant & Elmore Company or to its order, grain represented by the bills of lading held by plaintiffs, without first obtaining the surrender of those bills. The result was that when the Durant & Elmore Company became insolvent on May 20, 1910, the plaintiffs held New England order bills of lading specifying 16,500 bushels of oats consigned to Portland and 124,965 bushels of corn consigned to Boston, and Palmer bills calling for 15,000 bushels of rye, 97,500 bushels of oats and 151,000 bushels of corn consigned to New York city, upon which at that time they could not obtain a single bushel of grain. The New England bills were dated between November, 1909, and February 1, 1910, and the Palmer bills were dated between February 1, 1910, and March 11, 1910. The unpaid balance due plaintiffs for advances on the former at the time of the failure was $63,537.86 and on the latter $144,225. The question at issue under the first cause of action was whether or not the plaintiffs consented to and acquiesced in the defendant's allowing the Durant & Elmore Company to take possession of the grain without first requiring the surrender of the bills of lading then in the possession of the plaintiffs. The plaintiffs have recovered on this first cause of action upon the theory that they were *bona fide* holders of the bills of lading in a normal transaction between themselves and the Durant & Elmore Company in which they had made advances to the Durant & Elmore Company, secured by the bills of lading with the expectation on their part that the defendant railroad would not give up the grain represented by those bills except upon presentation of the bills of lading and in accordance with their terms. The evidence shows quite conclusively that whatever might have been the character of the first few transactions between the plaintiffs and the Durant & Elmore Company, the dealings between them set forth in the first cause of action were carried on pursuant to a well-defined understanding between plaintiffs and Durant & Elmore that so long as the Durant & Elmore Company paid the plaintiffs six per cent on their advances and half a cent per bushel on the grain specified in the bills of lading and allowed plaintiffs to retain the bills of lading the Durant & Elmore Company

were at liberty to get possession of the grain from the railroad and distribute it to its customers. The plaintiffs did not rely upon the security of the bills of lading for repayment of their advances, but upon their unbounded confidence in the genius and character of the Durant & Elmore Company's manager, Oliver, and the excellent credit of the Durant & Elmore Company itself. It was important for plaintiffs to have the bills of lading for use at their bankers, from whom they were borrowing a large part of the money they were advancing to the Durant & Elmore Company and to whom they never revealed the fact that Oliver was habitually getting possession of the grain without surrendering the bills of lading. These conclusions not only follow most naturally from the evidence, but are compelled by the evidence. It is not possible to rehearse within the limits of this opinion all of the evidence upon this issue. But reference will be made to parts of it. On this point the letter of the plaintiff Knight to Oliver dated December 1, 1909, is illuminating. Apparently Oliver had shipped out from an elevator in Buffalo certain grain for which plaintiffs then held the original bills of lading. Knight writes: "* * * Of course you understand that these B/L are practically useless to us, as the grain they represent has been shipped out of the elevator. Of course, we know it is all right with you, but we could not explain this matter to the banks, and we need all the collateral we have at present. We therefore hope you will clean these up rapidly, and be sure that no more is ordered out, at least until these are out of the way * * *." Being cross-examined as to the contents of this letter Knight said: "I believed it was all right with Durant & Elmore, because I believed that they were morally and financially responsible." The expression "clean up" is frequently used by the plaintiffs in their dealings with Oliver and means payment of the loans made by the plaintiffs to Durant & Elmore. Here is a definite assent to Durant & Elmore's diversion of grain while the bills of lading were in plaintiffs' possession, provided the former drafts were paid and the bills of lading against which they were drawn were gotten out of the way. They knew the bills of lading were valueless as security after the grain had been shipped out of the elevators, but they

nevertheless used them as collateral at their banks, concealing from the banks the unsubstantial character of the bills. In view of the suggestion contained in this letter, it is not strange that Durant & Elmore thereafter continued its practice of diverting grain in transit regardless of the bills of lading and that the plaintiffs continued making advances on bills of lading representing diverted grain. The scheme was much more profitable than a normal transaction. Again in August, 1908, the plaintiffs having been notified by the Spencer Kellogg Elevator that Durant & Elmore had ordered them to ship out certain grain then in the elevator and for which plaintiffs held bills of lading, wrote the elevator as follows: " Will you please, therefore, not ship out any more without our knowledge, but of course do not let Durant & Elmore know that we have given you these instructions. When they order any grain out, advise us and we will let you know if it is all right, *which it doubtless will be.*"

On the same day the plaintiffs wired Durant & Elmore that they had heard of their ordering out the grain from the elevator and inquired where it was and when they could collect on their bills of lading. That this conduct of Durant & Elmore was acceptable to plaintiffs is shown in letters written by plaintiffs to the elevator.

On August 15, 1908, they wrote: " We have your favor of the fourteenth, and contents noted. It is all right for you to take instructions from Durant & Elmore on the balance of the grain we have written you about. They have instructed us to draw on them. We find that one of the firm was away yesterday, which accounts for our inability to get an answer from them." This correspondence is convincing proof of plaintiffs' hearty co-operation with Durant & Elmore's plan to divert grain in transit without surrender of the bills of lading. On August eighteenth plaintiffs wrote: " You may take their instructions on the ' Harlem ' cargo to forward, and on any other future shipments which may go through your elevator for their account, as per our instructions heretofore given you, but we would thank you to advise us when you receive such instructions, so that we can be guided accordingly."

Coming down to November 30, 1909, plaintiffs wrote

Oliver: "Another point which I know you will realize the importance of, is to relieve us of any lake Bs/L representing grain which has been shipped out of the elevator at Buffalo. We understand the ' Squire ' and the ' Culligan ' lots of oats have been at least in part shipped out, and we would therefore like to clean these lots up. * * * We think if you will clean up some of these old lots of rail grain and the lots you have ordered out of Buffalo, *that we will be able to take care of all the corn you have coming.*" Then follows the letter of December 1, 1909, referred to above.

The plaintiffs first began doing business with Durant & Elmore in 1905. They never knew anybody except Oliver in those transactions, and the intimacy between the plaintiff Knight and Oliver became exceedingly close as is shown by the familiar and affectionate manner in which they addressed each other in their letters. The advantage derived by the plaintiffs from their intimacy with Oliver is shown by the fact, as found by the referee, that " during the year before the failure plaintiffs were receiving from Durant & Elmore commissions from speculative transactions at the rate of over $75,000 a year, and from commissions on bills of lading held and sent back to Albany over $20,000 a year." In addition to these commissions plaintiffs charged Durant & Elmore six per cent interest per annum on their advances, while they paid their banks in New York considerably less than six per cent. The plaintiffs sold little or none of the grain specified in these bills of lading. The interest on advances and the so-called commissions received by them made up their compensation for their loans to Durant & Elmore. The referee has found that "* * * plaintiffs did not receive or sell, as commission agents, any of the grain specified in these New England bills; the sole function of plaintiffs being to advance to Durant & Elmore money upon the security of said * * * bills until such a time as Durant & Elmore would instruct plaintiffs to send the bills back to Albany attached to drafts * * *." In order to meet the loan requirements of Durant & Elmore, it was necessary for plaintiffs to borrow from their banks. For this purpose they had to use the bills of lading as collateral. At the same time in order to enable Durant & Elmore to carry on its speculations

with the grain and obtain funds to repay plaintiffs' loans, it was essential that Durant & Elmore should obtain possession of the grain specified in the bills of lading. The bills of lading being in the banks, Durant & Elmore could not get possession of the grain from the defendant in the regular way. However, by collusion with defendant's agent, H. C. Palmer, the grain was not forwarded to the destination named in the bills, " but was reconsigned or delivered to Durant & Elmore at Oneonta, and the bills became spent bills soon after they were issued."

The referee has also found that plaintiffs retained these bills of lading for periods varying from two weeks to three months and until Durant & Elmore instructed them to return them to Albany with drafts attached specifying the oldest bills first. "* * * With few exceptions, these instructions were given long after the period of transit had expired * * *." And notwithstanding the fact that grain spoils if kept in cars too long and demurrage charges have to be paid on unloaded cars soon after they arrive at their destination, the plaintiffs made no inquiries of the railroads as to the whereabouts or condition of the grain called for in the New England bills.

In the twenty-ninth finding of fact the referee reports that "* * * On all the evidence I find that plaintiffs, when they received the bills of lading in the first cause of action, plaintiffs' exhibits A1–A135, inclusive, must have been suspicious that the grain covered by similar bills which plaintiffs had been receiving through the previous year had, to a large extent, come into Durant & Elmore's control and been disposed of while plaintiffs held the order bills, covering the same; and that the plaintiffs at said times had notice of facts which would put a reasonably prudent man on inquiry as to whether or not Durant & Elmore were obtaining control of and disposing of the grain specified on the bills which plaintiffs were accepting and holding for Durant & Elmore; and that the facts which had come to plaintiffs' knowledge prior to said times were such that a man of ordinary intelligence could not have avoided the suspicion that Durant & Elmore were somehow getting control of the grain and disposing of it while plaintiffs held the order bills of lading." Nevertheless

the referee finds that " The plaintiffs did not know or assent to the disposition or delivery made by the defendant of the grain referred to in the bills of lading in suit in the first cause of action."

I think the evidence shows the plaintiffs' suspicions had ripened into positive knowledge long before they made advances on the bills of lading mentioned in the first cause of action. It may be that at first they merely suspected that Durant & Elmore in some way had obtained possession of grain without first presenting the bills of lading, but it is quite clear from the correspondence between Oliver and Knight and the testimony given by Knight, that the latter had absolute knowledge of that fact long before he made the advances on the bills sued on, and acquiesced in that mode of procedure as the one best adapted to meet the wishes and plans of Oliver, acquiescence in which on the part of Knight was absolutely necessary, if his firm were to continue receiving the usual enormous returns on the money advanced to Durant & Elmore.

On December 3, 1909, the plaintiffs made an advance of $35,500 to Durant & Elmore on a draft to which were attached bills of lading covering the cargo of the *City of London.* At the time they made the advance plaintiffs knew that the bills were " spent " bills of lading and worthless as security. When Knight was asked on cross-examination why he did not insist upon Durant & Elmore taking up these bills immediately when he knew there was nothing behind them, he said he considered them good, " and I considered Durant & Elmore were good. * * * I didn't consider * * * that they would utilize that grain in any way." These communications and others too numerous to be detailed here emphasize the fact that the plaintiffs relied not upon the bills of lading as security for their advances, but solely upon their confidence in Durant & Elmore; that they never intended to require the carrier to hold the grain specified in those bills until the bills were surrendered to the carrier, but on the contrary were active and consenting parties to the delivery of the grain to Durant & Elmore without presentation of the bills of lading with the understanding that Durant & Elmore would

First Department, June, 1917.        [Vol. 178.

sell the grain and then pay off the advances. The one and only inquiry made by plaintiffs of the railroad as to grain specified in bills of lading held by them met with a rebuke by Durant & Elmore. The plaintiffs evidently had inquired of the railroad about grain which they expected to arrive in New York. Hearing of this inquiry, Durant & Elmore on February 11, 1910, wrote plaintiffs as follows: " By the way, please do not put tracers out for these consigned cars of ours, for it breaks up all our holding arrangements and is liable to cost us a great deal of money in demurrage. If you want anything rounded up at any time, let us know and we will do it from this end." In answer to this letter plaintiffs wrote: " Your favor of the eleventh at hand and we note carefully all you write in reference to putting tracers out on your consigned grain. We are glad to have your advice that this affects your holding arrangements and is liable to cost you money in the way of demurrage. The only thing we have done in this direction is to advise the roads here the car numbers for which we hold B/L and requesting them to see that the grain came forward promptly after reaching their lines but not to hurry it so that there will be no jam here of a whole lot of grain at one time on arrival which we trust will meet with your approval."

The learned referee was convinced that when plaintiffs received the bills of lading mentioned in the first cause of action, their former experiences with Durant & Elmore " were such that a man of ordinary intelligence could not have avoided the suspicion that Durant & Elmore were somehow getting control of the grain and disposing of it while plaintiffs held the order bills of lading."

The letters of plaintiffs already referred to certainly show beyond a reasonable doubt that plaintiffs had absolute knowledge that Durant & Elmore were getting control of the grain while plaintiffs held the bills of lading and acquiesced in the practice. Furthermore, there is no good reason why a sharp line should be drawn between the transactions set forth in the first cause of action and those preceding them. The former, like the latter, illustrated the highly profitable and unique scheme which plaintiffs and Durant & Elmore operated in concert. To say that plaintiffs were merely suspicious

of Durant & Elmore's conduct with reference to the grain covered by the New England bills of lading in the first cause of action is to fail to give due weight to the evidence. I am aware that plaintiffs must recover unless they had knowledge of and acquiesced in Durant & Elmore's practices. That knowledge and acquiescence have been proved beyond question.

The judgment so far as it allows a recovery against the defendant on the first cause of action should be reversed, with costs. In all other respects it should be affirmed and the complaint dismissed, with costs.

CLARKE, P. J., concurred.

Judgment affirmed, without costs.